## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

HOWARD J.,                                   Case No. 22-CV-0731 (NEB/JFD)

              Plaintiff,

v.                                           **REPORT AND RECOMMENDATION**

KILOLO KIJAKAZI,
*Acting Commissioner of Social Security*,

              Defendant.

Pursuant to 42 U.S.C. § 405(g), Plaintiff Howard J. seeks judicial review of a final decision by the Commissioner of Social Security denying his application for disability insurance benefits ("DIB"). (Soc. Sec. Admin. R. (hereinafter "R.") 1.)[1] Plaintiff, who was born in April of 1969, worked as a carpenter from April 2007 until September 2019 and as a janitor/maintenance worker from July 2001 until December 2012. (R. 186.) On September 16, 2019, Plaintiff stopped working, attributing that decision to his impairments. (R. 13.) A Social Security Administrative Law Judge ("ALJ") found Plaintiff suffered from the severe impairments of anxiety, autism spectrum disorder, depression, sciatica, severe obesity, and sleep apnea, as well as the non-severe impairments of hypertension, a sprained ankle, a torn tendon, and a neck sprain with a history of remote whiplash. (R. 14.)

---

[1] The consecutively paginated Social Security administrative record is filed at Docket Number 15. The Court cites to that pagination rather than to the docket number and page assigned by the Court's CM/ECF system.

The case is now before the Court on motions for summary judgment[2] filed by Plaintiff (Dkt. No. 17) and Defendant (Dkt. No. 19). Plaintiff seeks reversal of the final decision of the Commissioner of the Social Security Administration ("SSA") denying him benefits on the grounds that the Administrative Law Judge ("ALJ") erred in considering the medical source statement and opinion of Plaintiff's treating mental health therapist, Taylor Westin, MSW LGSW, and also erred in considering the reports and opinions of the consulting State Agency Psychologists. Defendant opposes Plaintiff's summary judgment motion and asks the Court to affirm the final decision, arguing that the ALJ properly evaluated the opinions provided by Ms. Westin and the State Agency Psychologists.

The cross-motions for summary judgment have been referred to the undersigned U.S. Magistrate Judge for a report and recommendation pursuant to 28 U.S.C. § 636(b)(1)(B) and District of Minnesota Local Rule 72.1(a)(3)(D). For the reasons set forth below, the Court finds that the ALJ erred in his evaluation of Ms. Westin's opinions but not in his evaluation of the opinions of the State Agency Psychologists. The Court therefore recommends that both motions for summary judgment be **GRANTED IN PART AND DENIED IN PART**, and that this matter be **REMANDED** to the Commissioner for further proceedings.

---

[2] On December 1, 2022, the District of Minnesota amended Local Rule 7.2, which governs procedures in social security cases, to conform to the Supplemental Rules for Social Security Actions Under 42 U.S.C. § 405(g). D. Minn. LR 7.2 advisory committee's note to 2022 amendment. The Supplemental Rules apply to actions filed on or after December 1, 2022. *Id.* (Dkt. No. 19.) Because Plaintiff filed this case before December 1, 2022 (the Complaint, Dkt. No. 1, was filed on March 22, 2022), the procedures established by the previous version of Local Rule 7.2 apply, including a provision that the Court resolve the case on cross-motions for summary judgment. *See* D. Minn. LR 7.2(c) (2015).

## I.    BACKGROUND

Plaintiff alleged a disability onset date of September 16, 2019, which was also the date on which he discontinued working. (R. 292.) His alleged impairments included "Anxiety, [Asperger's], Back Issues, Depression Clinical, and Suicidal Ideation." (R. 292, 321.) Plaintiff met the insured status requirements of the Social Security Act through December 31, 2023. (R. 318.)[3]

### A.    Relevant Medical History

Plaintiff states that he suffers from not only mental health impairments, but some physical impairments as well. The part of the Commissioner's final decision finding none of Plaintiff's physical impairments severe or disabling is not at issue in this appeal. Therefore, the Court concentrates the following medical history on Plaintiff's mental health impairments.

On September 24, 2019, shortly after he discontinued working, Plaintiff recounted a life-long history of depression and suicidal thoughts to Rebecca Leaders, MS LMFT, a mental health provider. (R. 440–41.) Plaintiff reported that he had attempted suicide twice in adolescence, at ages 16 and 17, and that even though he had not told anyone about these attempts, nor been hospitalized for them, his adolescent mental health issues had been such that his family had been afraid of him and his father excluded him from the family home, after which he was homeless for one and one-half years. (*Id*.) Plaintiff reported that he was

---

[3] The ALJ found a date last insured of December 31, 2024 (R. 13), but the administrative record shows a date last insured of December 31, 2023. (R. 318.) The difference is immaterial, because both dates are later than the date on which Plaintiff claims to have become disabled.

presently plagued by daily thoughts of suicide and that he experienced persistent anxiety that his wife would leave him because of his depression. (*Id*.) Plaintiff placed no value on his own life, and Ms. Leader noted that he displayed no emotional distress related to that thought. (R. 441.) Plaintiff stated that he continued to "go through the motions" of living only because of his relationship with his wife, who was the only person who mattered to him. (R. 440, 445.) Plaintiff stated he had had suicidal thoughts since his two adolescent suicide attempts, but also stated that he was now seeking mental health services due to increased symptoms. (R. 443.) His depression and anxiety were now affecting his ability to relate/communicate with others, affecting his self-care and interpersonal functioning. (*Id.*) He had taken a "permanent leave" from his job to "get [his] head straight." (*Id*.)

Ms. Leaders diagnosed Plaintiff with (1) autism spectrum disorder, (2) major depressive disorder, recurrent, moderate, (3) unspecified anxiety disorder, and (4) tobacco use disorder. (R. 448–50.) Ms. Leaders found Plaintiff's autism spectrum disorder manifested itself as "ritualized" behavior patterns, persistent deficits in social communication and nonverbal communication, and being upset with even small changes in routine. (*Id*.)

Ms. Leaders also diagnosed Plaintiff with a Major Depressive Disorder, Recurrent, Moderate. (R. 449.) She found Plaintiff had diminished interest; disrupted sleep with consequent chronic fatigue; feelings of worthlessness, hopelessness, and inappropriate guilt; a decreased ability to concentrate; and daily thoughts of suicide. (*Id*.) Plaintiff was started on an anti-depressant medication and began psychotherapy. (R. 459.)

Plaintiff met with Taylor Westin, MSW LGSW, for outpatient psychotherapy. Plaintiff's first session with Ms. Westin was on October 10, 2019, and he then continued seeing her on a near-weekly basis for 56 visits, each lasting approximately one hour. (R. 466–565.)[4] The last psychotherapy visit that is documented in the administrative record took place on March 19, 2022 (R. 127.) The goal of this therapy, identified on the first visit on October 10, 2019 was Plaintiff gaining control over his suicidal thinking (R. 466.) Suicidal thoughts are raised in the progress notes of nearly every visit Plaintiff had with Ms. Westin and nearly every session ends with the note "[Plaintiff] will continue to focus on coping with suicidal ideation" or similar words. (*See, e.g.,* R. 483, 550, 557, 561, 563, 565.)

The notes of other therapists whom Plaintiff saw less frequently than Ms. Westin also reflect the centrality of suicidal ideation to Plaintiff's psychological situation. Ms. Pamela Jarvis's[5] notes of a session with Plaintiff on January 8, 2020 state "Ongoing chronic S[uicidal] I[deation]. Denies intent or plan." (R. 460.) Ms. Jarvis next saw Plaintiff on August 8, 2020 and again noted "chronic SI" (from context, "SI" is "suicidal ideation") and "suicidal thoughts" with a "lack of desire for follow through." (R. 553.) Ms. Leader, at initial intake on September 24, 2019, noted Plaintiff's "daily suicidal thoughts."

[4] The cited range of 99 pages of the administrative record is not exclusively notes of Plaintiff's therapy visits with Ms. Westin, but the bulk of these pages are Ms. Westin's psychotherapy progress notes.

[5] The Court's review of the administrative record shows that Plaintiff met with Ms. Westin weekly, and met with a supervisory therapist, such as Ms. Jarvis, less frequently.

In a session with Ms. Westin on January 24, 2020, she noted, consistently with Ms. Leader's observation of a "lack of desire for follow through," that Plaintiff "believes the fixation is more about his death as opposed to suicidal thoughts specifically as he sometimes will think about accidents that could happen to him." (R. 481.) Neither Ms. Westin nor Ms. Leaders documented any conclusions they drew from this about the risk Plaintiff posed to himself of self-harm. (*Id.*)

On May 26, 2020, by which time she had been seeing Plaintiff one hour per week for about eight consecutive months, Ms. Westin wrote a letter, addressed "To Whom It May Concern," regarding Plaintiff's application for DIB. (R. 519–21.) Ms. Westin wrote that Plaintiff had "a long history of symptoms" and that he was consistent in reporting symptoms of autism spectrum disorder, including rigid thinking, difficulty with transitions, and fixations. Ms. Westin also wrote that Plaintiff was consistent in reporting symptoms of depression, "including sleep difficulties, fatigue, lack of interest in most activities, and memory difficulties." Ms. Westin described Plaintiff as "fixated on suicide." Because of the impact on functionality his mental impairments would have, and because Plaintiff, while at work, experienced an increase of thoughts about suicidal planning, including thoughts about what means of self-harm were close to hand, Ms. Westin opined that Plaintiff "likely will be unable to find/keep competitive employment in the foreseeable future." She stated that although Plaintiff's symptoms could be ameliorated, complete recovery from the symptoms of anxiety and depression was unlikely.

A little over four months after writing her "To Whom It May Concern" letter, on October 6, 2020, Ms. Westin completed a Mental Medical Source Statement. (R. 521–24.)

In this document, Ms. Westin noted that Plaintiff's mental impairment had lasted, or was expected to last, more than 12 months, and in answer to the question "is your patient a malingerer?," checked the box for "no." Ms. Westin rated as "extreme" Plaintiff's limitations in "working in coordination with, or proximity to, others without being distracted by them"; "interact appropriately with the general public"; and "ability to tolerate normal levels of stress." Ms. Westin rated as "marked" Plaintiff's limitations in being able to "complete a normal workday and work week, without interruptions from psychologically-based symptoms, and perform at a consistent pace without an unreasonable number and length of rest periods"; "respond appropriately to changes in the work setting"; and "be aware of normal hazards and take appropriate precautions." Of the 21 areas of potential impairment Ms. Westin was asked to opine upon, she stated Plaintiff had no, or only mild, impairment, in just five areas. In all others, she found at least a moderate impairment.

Ms. Westin also indicated that Plaintiff had a "[m]edically-documented history of chronic organic mental, schizophrenic, affective, or other disorder of at least 2 years' duration and: (a) Medical treatment, mental health therapy, psychosocial support(s), or a highly structured setting(s) that is ongoing and diminishes the symptoms and signs of the mental disorder; (b) A minimal capacity to adapt to changes in the environment or demands that are not already part of the patient's daily life." (R. 523.)

On April 6, 2020, State Agency Psychologist[6] Jeffrey Boyd, Ph.D., L.P. found on initial application that Plaintiff had "moderate" limitations in three out of the four Paragraph "B"[7] criteria, namely interact with others; concentrate, persist, or maintain pace; and adapt or manage oneself. (R. 185.) Dr. Boyd also found a mild limitation in the fourth Paragraph B criterion of understand, remember, or apply information. (*Id.*) Dr. Boyd found that "evidence does not establish the presence of the 'C Criteria.'" (R. 181.) Dr. Boyd also found that "[c]laimant's ability to handle supervision would be restricted secondary to reduced stress tolerance but adequate to cope with reasonably supportive supervisory styles that could be expected to be found in many customary work settings." (R. 185.) On June 2, 2020, State Agency Psychologist Lauren A. Cohen, Ph.D. made the same findings on review that Dr. Boyd had made in April. (R. 196–98.) Dr. Cohen's findings included a word-for-word repetition of Dr. Boyd's finding that Plaintiff's reduced stress tolerance meant he was restricted to workplace environments with a "reasonably supportive supervisory style." (R. 201.)

---

[6] Determinations of disability under the Social Security Act are frequently made in the first instance by state agencies. In Minnesota, Disability Determination Services is a Minnesota state government agency that "evaluates claims for disability benefits using Social Security Administration ('SSA') guidelines." "SSA employs the services of the Minnesota DDS to make medical eligibility decisions for disability and blindness applicants on behalf of the Commissioner of SSA." mn.gov/deed/programs-services/dds/ (last visited July 26, 2023).

[7] The Paragraph B criteria are four broad categories of mental functional limitations used to assess a claimant's mental functional limitations. The four categories are cross-identified in 20 C.F.R. § 404.1520a(c), and in the listings at 20 C.F.R. part 404, subpart P, appendix 1, § 12.00E(1)-(4); § 12.04, paragraph B (hence the common reference to "paragraph B" factors). The four categories are (1) ability to understand, remember, or apply information; (2) ability to interact with others; (3) ability to concentrate, persist, or maintain pace; and (4) ability to adapt or manage oneself. *See* 20 C.F.R. § 404.1520a(c)(3).

### B.    Procedural History

On December 3, 2019, Plaintiff applied for DIB, listing his disabling conditions as "Anxiety, [Asperger's], Back Issues, Depression Clinical, and Suicidal Ideation." (R. 292, 321.) His application was denied on both initial application (R. 189) and after reconsideration. (R. 1.) An Administrative Law Judge ("ALJ") held a hearing (by telephone, because of the COVID-19 pandemic) on Plaintiff's DIB application on December 10, 2020 (R. 153–73 (hearing transcript)), and on December 29, 2020 issued a decision finding Plaintiff was not disabled within the meaning of the Social Security Act. (R. 11–26.) Plaintiff requested review from Social Security's Appeals Council on March 4, 2021. (R. 289.) On January 19, 2022 the Appeals Council affirmed the ALJ. (R. 1.) This made the ALJ's decision the final decision of the Commissioner of Social Security for the purpose of judicial review in accordance with 42 U.S.C. § 405(g).

Plaintiff now petitions this Court for review of the final agency decision pursuant to 42 U.S.C. § 405(g). Plaintiff claims the Commissioner's decision denying him disability benefits is not supported by substantial evidence because the ALJ incorrectly evaluated the evidence from Ms. Westin, Plaintiff's treating mental health provider, when the ALJ failed to consider the "supportability" of her opinion pursuant to 20 C.F.R. § 404.1520c(c)(1). Plaintiff also claims that the ALJ failed to properly take account of the opinions of the State Agency Psychologists that Plaintiff could work only in workplace settings with a "reasonably supportive supervisory style." The result of both errors, Plaintiff argues, was an inaccurate determination by the ALJ of Plaintiff's RFC. (Pl.'s Mem. Supp. Mot. Summ. J. at 8, 12, Dkt. No. 18.)  Defendant counters by stating that the ALJ properly took account

9

of both Ms. Westin's opinions and those of the State Agency Psychologists and that his findings that Ms. Westin's opinions were unpersuasive (R. 28) and those of the State Agency Psychologists "partially persuasive" (R. 29) were supported by the record. (Def.'s Mem. Supp. Mot. Summ. J. at 8, Dkt. No. 20.)

At the telephonic hearing before the ALJ, Plaintiff testified that he stopped working because his thoughts of suicide were becoming "too strong." (R. 160.) Plaintiff explained that being around power tools while having suicidal thoughts is "like being suicidal and working in a gun store or something. I mean, it's probably not a good idea." (R. 162.) Although he was seeing Ms. Westin for psychotherapy once per week and taking an anti-depressant medication, Plaintiff testified that he still ruminated about suicide for approximately three hours out of an eight-hour workday. (R. 160–61.) Plaintiff also described his lower back pain, which he said caused hours of "excruciating" pain if he lifted so much as a 30-pound tool bag, and a sprain of his right ankle that Plaintiff said was the result of inattention on his part. (R. 163, 166.) When questioned by his non-attorney representative, Bartholomew Paynter, Plaintiff categorized his rigid thinking and lack of emotion as manifestations of autism. (R. 170.) In social situations Plaintiff described himself as "a loner. I just prefer staying by myself in my own house, not going over to see anyone or nothing. I don't like visiting people" and "basically, people always annoy me. I will – if I go to someone's house, I'll usually spend my entire time with a dog or a cat so that people leave me alone." (R. 172.)

After Plaintiff testified, the ALJ called as a witness vocational expert Beverly Solyntjes. (R. 168.) The ALJ asked her to classify the exertion required in Plaintiff's prior

relevant work as a carpenter and as a maintenance worker in a liquor store that he and his wife operated. (R. 169.) Ms. Solyntjes testified that although carpentry is classified generally as a medium exertion occupation, she classified the specific work that Plaintiff had been doing as "very heavy" and "skilled." (*Id.*) Ms. Solyntjes classified Plaintiff's liquor store maintenance work as medium exertion and semi-skilled. (*Id.*) The ALJ then asked Ms. Solyntjes to assume an individual of Plaintiff's age and education who was limited to light work with some additional limitations:

> Occasional climbing of ramps and stairs, no climbing of ladders, ropes, or scaffolds. Regarding balancing, no standing, walking, running, or crouching on narrow, slippery, or erratically moving surfaces. Frequent stooping, frequent kneeling, frequent crouching, and frequent crawling. Environmental limitations, no work at unprotected heights, no work in moving mechanical parts, no kind of moving machinery especially at a loss of balance in proximity of that machinery. Would pose a severe safety hazard to life or limb. No operation of a motor vehicle. The following mental limitations, limited to performing simple, routine, and repetitive tasks using judgment limited to simple work-related decisions. Interactions with supervisors and coworkers would be restricted to occasional and superficial interactions such that work is rated no lower than A, on the people scale of Appendix B, to the Dot 1991 revised editions.[8] Regarding interactions with the general public, I specify no interaction with the general public.

(R. 169–70.) Ms. Solyntjes testified that the hypothetical person described by the ALJ could not perform Plaintiff's prior relevant work as a carpenter or maintenance worker. (R.

---

[8] Appendix B to the Dictionary of Occupational Titles includes a scale expressing a job's highest appropriate function in relation to people. *See* Dictionary of Occupational Titles, App'x B (4th ed., rev. 1991). This people scale ranges from 0 to 8, with lower numbers indicating greater ability to function around others. A scale score of 0 indicates a person who can mentor others. A scale score of 8 indicates a lower degree of function, limited to taking instructions and helping others.

170.) However, Ms. Solyntjes did opine that Plaintiff could work at the light-exertion jobs of routing clerk, mail clerk, or merchandise marker and that there were approximately 40,000 jobs for routing clerks in the national economy, 13,000 for mail clerks, and 129,000 for merchandise markers. (R. 170–71.)

The ALJ issued a written decision on December 29, 2020 summarizing his findings. That decision followed the five-step sequential analysis for social security disability determinations described in 20 C.F.R. § 404.1520. At each step, the ALJ considered whether Plaintiff was disabled based on the criteria of that step. If Plaintiff was not disabled under the criteria of a particular step, the ALJ proceeded to the next step. *See* 20 C.F.R. § 404.1520(a)(4).

At step one, the ALJ determined that Plaintiff had not engaged in substantial gainful activity[9] after his alleged disability onset date of September 16, 2019. (R. 13.)

At step two, the ALJ found that Plaintiff had the severe impairments of anxiety, autism spectrum disorder, depression, sciatica, severe obesity, and sleep apnea. (R. 14.) The ALJ found Plaintiff's hypertension, sprained right ankle with peroneal tendon tear, and neck sprain and muscle spasm with a history of remote whiplash to not be severe[10]

---

[9] The Social Security Administration uses "substantial gainful activity" as a synonym for working for compensation. *See* 20 C.F.R. § 404.1572. If a claimant can engage in "substantial gainful activity" after their claimed onset of disability date, they are not disabled for SSA purposes. 20 C.F.R. § 404.1520(a)(4)(i).

[10] The SSA considers an impairment not severe if "it does not significantly limit [a claimant's] ability to do basic work activities," such as walking, standing, seeing, hearing, speaking, remembering, using judgment, and responding appropriately to the work environment. 20 C.F.R. §§ 404.1520(c), 404.1522. In contrast, a severe impairment must

because none of these conditions imposed more than a minimal limitation on Plaintiff's ability to perform work-related tasks. (*Id.*) The ALJ also found Plaintiff's ankle sprain and peroneal tendon tear were not severe for the additional reason that they had not lasted more than 12 months. (*Id.*)

At step three, the ALJ was called upon to determine whether any of Plaintiff's severe impairments were disabling by consulting the SSA's list of impairments at 20 C.F.R. Part 404, Subpart P, Appendix 1. *See* 20 C.F.R. § 404.1520(d). These listed impairments are "severe enough to prevent an individual from doing any gainful activity, regardless of his or her age, education, or work experience." 20 C.F.R. § 404.1525(a). To be considered disabled at Step Three because he matches a listing, Plaintiff's impairment must meet every element of a listing. *Sullivan v. Zebley*, 493 U.S. 521, 530 (1990) ("an impairment that manifests only some of those criteria, no matter how severely, does not qualify."). Plaintiff's listed impairment would also have to have lasted or be expected to last for a continuous period of 12 months or to result in death. 20 C.F.R. § 404.1509. Since none of Plaintiff's severe impairments were listed, the ALJ, following the criteria of 20 C.F.R. § 404.1526 ("Medical Equivalence") then evaluated each of Plaintiff's severe impairments to decide whether that impairment was "at least equal in severity and duration to the criteria of any listed impairment."

---

significantly limit a claimant's ability to do these activities, and the impairment must last a minimum of 12 months. 20 C.F.R. §§ 404.1522, 404.1509.

Turning first to Plaintiff's physical impairments, the ALJ measured Plaintiff's back impairment against the standards of Listing 1.04, "disorders of the spine" and evaluated the aggravating effect of Plaintiff's obesity under Social Security Ruling 19-2p. The ALJ concluded that Plaintiff's back impairment, compounded by obesity, was not of equal severity to any listed severe impairment because Plaintiff was neurologically intact and capable of ambulating effectively without an assistance device. (R. 14.) Plaintiff was also capable of performing bilateral fine and gross hand manipulations. (*Id.*)

The ALJ then turned to Plaintiff's mental health impairments. The ALJ first compared Plaintiff's impairments to the listings for depressive, bipolar, and related disorders (listing 12.04); anxiety and obsessive-compulsive disorders (listing 12.06); and autism spectrum disorders (listing 12.10). (R. 14.) Listings 12.04 and 12.06 have three paragraphs, denominated A, B, and C. If Plaintiff satisfied paragraph A and either paragraph B or C, he would be considered disabled under those listings. Listing 12.10 has two paragraphs, A and B. If Plaintiff met the criteria of both paragraphs, he would be considered disabled under Listing 12.10. While paragraph A varies depending on the mental illness that is the subject of the listing, paragraphs B and C are identical in listings 12.04, 12.06, and 12.10.

Paragraph B describes four broad, general areas of mental functioning. To satisfy the paragraph B criteria, a claimant must have an extreme limitation in one of these areas or a marked limitation in two of these areas. A claimant with an extreme limitation is unable to function independently, appropriately, or effectively and on a sustained basis, while a claimant with a marked limitation has a seriously limited ability to function independently,

14

appropriately, or effectively and on a sustained basis. 20 C.F.R. Part 404, Subpart P, Appendix 1, § 12.00F2.

Of the four areas described in Paragraph B, the ALJ found that Plaintiff had no limitation in understanding, remembering, or applying information (R. 15); a moderate limitation in interacting with others (*id.*); a moderate limitation in concentrating, persisting, or maintaining pace (*id.*); and a moderate limitation in adapting or managing oneself (*id.*) With respect to the final Paragraph B area, "adapt or manage oneself," the ALJ noted that Plaintiff had "acknowledged" to Ms. Westin that what he described as suicidal thoughts were actually thoughts about his own death "as he sometimes thought about accidents that could happen to him." (R. 16.) Because Plaintiff had no marked or extreme limitations, the ALJ found that Plaintiff did not satisfy the criteria of Paragraph B. (*Id.*)

Paragraph C provides criteria for evaluating "serious and persistent mental disorders." A "serious and persistent" mental disorder is one in which there is a medically documented history of the existence of the disorder over a period of at least two years, plus evidence that satisfies the criteria in C1 and C2. To satisfy C1 a claimant shows reliance, on an ongoing basis, on medical treatment, mental health therapy, psychosocial support, or a highly structured setting to diminish the symptoms and signs of a mental disorder. To satisfy C2 a claimant shows that their adjustment has been only marginal even if symptoms and signs of a mental impairment have diminished. A marginal adjustment means a claimant's adaptation to the requirements of daily life is fragile, that is, the claimant has only minimal capacity to adapt to changes in their environment. The ALJ found that Plaintiff did not satisfy the Paragraph C criteria because there was no evidence of a

psychiatric hospitalization of extended duration, structured living arrangement, or increase in treatment for his mental impairment. (R. 16.)

As the last task before leaving Step Three for Step Four, the ALJ used the above findings to craft a residual functional capacity for Plaintiff.[11] The ALJ found that Plaintiff

> has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) except occasional climbing of ramps and stairs occasionally [sic]. No climbing of ladders, ropes, or scaffolds. Regarding balance – no standing, walking, running, or crouching on narrow, slippery, or erratically moving surfaces. Frequent stooping, frequent kneeling, frequent crouching, and frequent crawling. Environmental limitations: no work at unprotected heights; no work near moving mechanical parts (i.e. the kind of moving machinery such that a loss of balance and proximity to that machinery would pose severe safety hazard to life or limb); no operation of a motor vehicle. The following mental limitations: limited to performing simple, routine, and repetitive tasks. Using judgment limited to simple work-related decisions. Interactions with supervisors and co-workers limited to occasional and superficial interaction such that work is rated no lower than "8" on the people scale of appendix B to the DOT, 1991 revised edition. Regarding interactions with the general public, specified no interactions with the general public.

The ALJ, at Step Four, found that Plaintiff could not perform his past work as a carpenter or a janitor (R. 24), but at Step Five the ALJ found, based on the hearing testimony of Ms. Solyntjes, that Plaintiff could perform work that existed in substantial numbers in the national economy. (R. 25.) Therefore, concluded the ALJ, Plaintiff was not disabled within the meaning of the Social Security Act. (R. 26.)

---

[11] "Residual Functional Capacity" is the most a person can do despite any functional limitations and restrictions resulting from a medically determinable impairment or combination of impairments. SSAR 96-8p, 61 Fed. Reg. 34474 (Jul. 2, 1996).

## II.    STANDARD OF REVIEW

Judicial review of the Commissioner's denial of benefits is limited. The district court "reverses the findings of the Commissioner only if they are unsupported by substantial evidence or result from an error of law." *Nash v. Comm'r, Soc. Sec. Admin.*, 907 F.3d 1086, 1089 (8th Cir. 2018) (citing 42 U.S.C. § 405(g)). "Substantial evidence is less than a preponderance but is enough that a reasonable mind would find it adequate to support the Commissioner's conclusion." *Krogmeier v. Barnhart*, 294 F.3d 1019, 1022 (8th Cir. 2002) (citing *Prosch v. Apfel*, 201 F.3d 1010, 1012 (8th Cir. 2000)). The Court must examine "evidence that detracts from the Commissioner's decision as well as evidence that supports it." *Id.* (citing *Craig v. Apfel*, 212 F.3d 433, 436 (8th Cir. 2000)). The Court may not reverse the ALJ's decision simply because substantial evidence would support a different outcome or the Court would have decided the case differently. *Id.* (citing *Woolf v. Shalala*, 3 F.3d 1210, 1213 (8th Cir. 1993)). In other words, if it is possible to reach two inconsistent positions from the evidence and one of those positions is that of the Commissioner, the Court must affirm the decision. *Robinson v. Sullivan*, 956 F.2d 836, 838 (8th Cir. 1992).

A claimant has the burden of proving disability. *See Roth v. Shalala*, 45 F.3d 279, 282 (8th Cir. 1995). To meet the definition of disability for DIB, the claimant must establish that he is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). The disability, not just the impairment, must have

17

lasted or be expected to last for at least twelve months. *Titus v. Sullivan*, 4 F.3d 590, 594 (8th Cir. 1993).

### III.    ANALYSIS

#### A.    The ALJ Erred in Evaluating the Supportability of Ms. Westin's Opinions

Plaintiff asserts that the ALJ did not adequately address the supportability requirement of 20 C.F.R. § 404.1520c when evaluating the opinions of Plaintiff's treating mental health provider, Ms. Westin. In response, Defendant argues that even though the ALJ may have used the wrong terminology ("consistent" and "inconsistent" instead of "supported" and "unsupported"), the ALJ in fact checked Ms. Westin's opinion against her own progress notes from her psychotherapy sessions with Plaintiff and found the opinion not supported by the notes. (Def.'s Mem. Supp. Mot. Summ. J. at 6–9.) The Court agrees with Plaintiff and further finds that this shortcoming is serious enough to require remand for further proceedings.

As a preliminary matter, Ms. Westin offered her opinion twice, the first time in a To Whom It May Concern letter dated May 26, 2020 (R. 519–20) and then in a medical source statement dated October 6, 2020 (R. 521–24). It is not entirely clear whether Plaintiff challenges the ALJ's supportability analysis of the letter, the source statement, or both. Plaintiff states "[t]he ALJ failed to properly address the supportability factor regarding Ms. Westin's medical source statement of October 6, 2020." (Pl.'s Mem. Supp. Mot. Summ. J. at 9.) At other points, though, Plaintiff states that "the ALJ failed to consider the supportability factor when determining the persuasiveness of Ms. Westin's *opinions*"

(plural). (*Id*. at 11) (emphasis added). At another point, Plaintiff writes that "the regulation indicates that the Commissioner will consider all of the medical opinions from a medical source." (*Id.* at 8.)

The Court will consider the ALJ's treatment of supportability as to both of Ms. Westin's opinions. The ALJ did not adequately consider supportability as to either opinion, and since a shortfall in the ALJ's supportability analysis as to either opinion would require remand, the Court does not change the outcome by considering both opinions.

The social security regulations identify supportability and consistency as the two most important factors an ALJ should consider when deciding the persuasiveness of a medical opinion. "The factors of supportability . . . and consistency . . . are the most important factors we consider when we determine how persuasive we find a medical source's medical opinions of prior administrative medical findings to be." 20 C.F.R. § 404.1520c(b)(2)(c). Supportability is defined by the regulations as "[t]he more relevant the objective medical evidence and supporting explanations presented by a medical source are to support his or her medical opinion(s) or prior administrative medical finding(s), the more persuasive the medical opinion(s) or prior administrative medical finding(s) will be," 20 C.F.R. § 404.1520c(c)(1), while consistency is defined as "[t]he more consistent a medical opinion(s) or prior administrative medical finding(s) is with the evidence from other medical sources and nonmedical sources in the claim, the more persuasive the medical opinion(s) or prior administrative medical finding(s) will be," 20 C.F.R. § 404.1520c(c)(2). While supportability looks to how well the medical source justifies their

19

own opinion, consistency looks to how well the medical source's opinion fits with evidence from other medical sources.

Plaintiff alleges that the ALJ erred only in his analysis of the supportability of Ms. Westin's opinions. Plaintiff does not claim that the ALJ erred in his analysis of consistency.

The ALJ found both of Ms. Westin's opinions unpersuasive. (R. 23.) The ALJ, when considering her letter, characterized her as "an acceptable medical source because she was only a licensed social worker." (*Id.*) When considering her source report, the ALJ wrote that "[a]s noted, Ms. Westin was [sic] non-programmable source." (*Id.*) The first characterization is internally contradictory, the language "acceptable medical source" being undercut by "only a licensed social worker." The second characterization is even more unclear. It begins with "as noted" but the Court cannot find the language "non-programmable source" anywhere else in the ALJ's opinion. If the reference is to Ms. Westin being either (a) an acceptable medical source or (b) "only" a licensed social worker, it is not clear how "non-programmable source" is synonymous with either. The Court does not know what a "non-programmable source" is, and the ALJ has not explained the term. Plaintiff's counsel shares the Court's confusion (*see* R. 398 (Ltr. from Pl.'s Counsel to SSA Appeals Council ("It is not clear what exactly was meant by ['non-programmable source'] . . . ."))). To the extent the ALJ intended these statements to bear on supportability, the Court cannot attach any significance, positive or negative, to the ALJ's overall consideration of Ms. Westin's opinions.

The ALJ found Ms. Westin's opinion expressed in the letter unsupported because that opinion was inconsistent with Ms. Westin's psychotherapy notes, particularly when

those notes indicated a normal or near-normal mental status exam,[12] and inconsistent with Plaintiff's PHQ-9 and GAD-7 scores. (R. 23.) The ALJ also stated that Ms. Westin "ignored the difference between thoughts of having accidents/death and actual suicidal ideation." (*Id*.) The ALJ found Ms. Westin's source report unsupported because although she first began treating Plaintiff on October 10, 2019, and the source report was completed in October of 2020, Ms. Westin gave an opinion concerning Plaintiff's mental health history going back two years. (*Id.*) The ALJ stated that this was based entirely on Plaintiff's self-reporting and not "objective medical evidence." (*Id*.) The ALJ also stated that "there was no evidence" that Plaintiff had ever experienced "an episode of decompensation, *suicide attempt, or actual suicidal ideation*." (*Id*.) (emphasis added).[13]

The ALJ erred because when deciding to what extent Ms. Westin's opinions were supportable, he materially mischaracterized the administrative record, failed to clarify what "objective medical evidence" is in the context of mental health, and substituted his own lay conclusions for the non-conclusory observations of mental health professionals.

---

[12] The ALJ uses "consistent" and "inconsistent" whether analyzing supportability or consistency, which risks confusion in determining what, exactly, the ALJ considered support (originating with Ms. Westin herself) or consistency (originating in sources other than Ms. Westin). The Court has categorized material originating with Ms. Westin as support/nonsupport material, and material originating from sources other than Ms. Westin as consistent/inconsistent material, even though the ALJ calls all of it consistent/inconsistent.

[13] The ALJ does not say whether "no evidence" means no evidence in Ms. Westin's notes of her sessions with Plaintiff, in which case it would go to supportability, or no evidence from other sources, in which case it would go to consistency. The Court, in order to be sure to consider everything the ALJ might have considered support, will include this statement about decompensation, suicide attempts, and suicidal ideation as material going to supportability, even though there is a risk the Court is being over-inclusive.

The first item mentioned by the ALJ is the "normal" mental status exams that are in Ms. Westin's treatment notes. The Court believes the ALJ was referring to a section that appears in all of Ms. Westin's treatment notes labeled "Brief Mental Status Exam." The Court uses the treatment note dated March 27, 2020 (R. 512) as an example, but there are more than 40 others from which to choose. The brief mental status exam collected four data points. The first, "Judgment" was usually marked as "good." The second, "Insight" was also routinely marked as "good." The third item is "Orientation," and Ms. Westin typically marked this as "alert and oriented as to time, place, and circumstances/situation." The fourth and last entry is for "Affect" and Ms. Westin marked this as "appropriate." Nowhere in the administrative record did Ms. Westin label the Brief Mental Status Exam as either normal or abnormal, nor could she have. A person can be alert and oriented and still be depressed, even suicidal. The ALJ did not explain why he attached any significance to these brief portions of Ms. Westin's notes. When there was a more comprehensive review of Plaintiff's mental status—for example at Ms. Leader's intake examination of Plaintiff on September 24, 2019—the ALJ noted that the finding was "abnormal." (R. 19 (citing R. 445).)

A district court in this circuit has compellingly cautioned ALJs against over-reliance on the brief mental status checklists that are part of psychotherapist's notes. *Fursteneau v. Saul*, No. 6:19-cv-03201-NKL, 2020 WL 3287947, at *3 (W.D. Mo. June 18, 2020) ("that [Plaintiff] could focus during her thirty-to-sixty minute psychotherapy appointments with Dr. Nguyen is not inconsistent with Dr. Nguyen's determination that [Plaintiff] was extremely limited [as to other psychological functions]").

22

The ALJ also asserted that Plaintiff's PHQ-9 and GAD-7[14] scores are "around 12 and 13 that reflect only mildly moderate symptomology and functional limitations." (R. 23.) This is simply incorrect. On September 24, 2019, at his intake appointment with Ms. Leader, Plaintiff's PHQ-9 score was 21 and his GAD-7 score was 17. The ALJ characterized these scores as demonstrating "moderately severe symptomology and functional limitations." (R. 19 (citing R. 441–42).) The ALJ next reported that "[t]wo days later, on September 26, 2019, was the claimant's first outpatient visit since he started Celexa [an antidepressant]." (R. 19.) The ALJ noted that Plaintiff's PHQ-9 score had gone down to 13 and did not mention a GAD-7 score. In fact, this score was not from "two days later, on September 26"; the records the ALJ quoted were from an appointment with Pamela Jarvis on October 22, 2019, over a month after his initial intake appointment. (*See* R. 459 ("This is his first outpatient o.v. since . . . he was started on Celexa for his depressive symptomology.").)[15] The ALJ next noted Plaintiff's scores on November 27, 2019, when his PHQ-9 score fell one point, to 20, and his GAD-7 score increased two points, to 19. (R. 20.) As noted above, scores in this range, according to the ALJ, are indicative of

---

[14] "GAD" is an acronym for generalized anxiety disorder, and "PHQ" is an acronym for Patient Health Questionnaire. GAD-7 and PHQ-9 questionnaires are completed independently by a patient and are intended to reflect subjective, self-reported symptoms. *See Amy R. v. Saul*, No. 19-CV-1508 (KMM), 2020 WL 3077502, at *1 (D. Minn. June 10, 2020).

[15] The administrative record contains no notes of a visit by Plaintiff to a mental health provider on September 26, 2019. Although at places in the notes of the October 22, 2019 visit there are references to a "diagnosed date" of September 26, 2019 (R. 458), there are also references to medication start dates of September 24, 2019 and October 22, 2019 (R. 459).

"moderately severe symptomology and functional limitations." The final test score recounted in the ALJ's opinion was from August 6, 2020, when Plaintiff's PHQ-9 score was 12, which the ALJ stated "reflected mildly moderate symptomology and functional limitations." (R. 21.) In all, there are five PHQ-9 results in the administrative record, with scores of 21, 13, 20, 12, and 12, and only two GAD-7 results, with scores of 17 and 19. In other words, two out of five PHQ-9 scores reflected, in the ALJ's own words, moderate symptomology and functional limitations, while the only two GAD-7 scores that were reported were both in the moderate range as well. The ALJ mis-stated the administrative record when he characterized Plaintiff's scores as "12 and 13." While this mis-statement is particularly true of Plaintiff's GAD-7 scores, both of which were elevated, it is also true of Plaintiff's GHQ-9 scores, which went up and down.[16]

Finally, as to both Ms. Westin's letter and to her source report, the ALJ focused on what he apparently believed was a lacuna in her analysis. With respect to the letter, the ALJ wrote that Ms. Westin "ignored the difference between thoughts of having accidents/death and actual suicidal ideation." (R. 23.) With respect to the source letter, the ALJ wrote that "there was no evidence of . . . suicide attempt or actual suicidal ideation." (*Id.*) Again, this was not accurate. Ms. Westin saw Plaintiff 56 times, from October 10,

---

[16] It is not clear from the ALJ's opinion whether he reported PHQ-9 and GAD-7 scores because he believed they represented "objective medical evidence," but they are not. These two psychological instruments are set out in full at R. 441–42. They are subjective, consisting of questions a patient answers. These questions ask whether the patient "feels bad" about themselves, or worries too much about different things. In other words, the only difference between these instruments and an interview with a therapist is that one is written and the other is oral.

2019 until the last visit recorded in the administrative record on March 11, 2021, with 24 of those visits preceding Ms. Westin's To Whom it May Concern letter of May 26, 2020 and 43 of them preceding Ms. Westin's completion of the medical source report on October 6, 2020. In every single set of progress notes memorializing those visits, Ms. Westin noted Plaintiff's "suicidal ideation," "thoughts of suicide," "fixation on suicide," or "suicidal fixation." The ALJ set all this aside based on his discovery that on two occasions Plaintiff said he had thoughts about his own death. (R. 20.) The ALJ, based on these two comments, stated that Plaintiff "never actually had suicidal ideation" (R. 21) and further stated that these two comments showed that Ms. Westin's opinion was inconsistent with her own treatment notes because she did not explain the distinction between actual suicidal ideation and mere thoughts of death (R. 23).

The Court of course understands the standard of review it must apply to the ALJ's opinion and that if the ALJ's opinion is supported by substantial evidence the Court must affirm the ALJ. But when the ALJ claimed that Ms. Westin did not recognize that there is a distinction between suicidal ideation and thoughts of death, he was not pointing to evidence; he was substituting his own judgment for Ms. Westin's, and more seriously, was substituting his own *clinical* judgment for Ms. Westin's. The ALJ is not qualified to make clinical judgments. He may direct attention to the opinions of qualified clinicians that either bolster or cast doubt on the clinical judgments of a medical source, but the ALJ in this case did not do so. The ALJ did not point to any medical or psychological source that supported the ALJ's pronouncement that a psychiatrist or psychologist must recognize that there is

any clinical or diagnostic difference between a patient who ruminates about death versus a patient who thinks of death by suicide.

If the ALJ, in a different case, had announced that he had examined the MRI of the Plaintiff's spine and that, based on his own clinical assessment, the ALJ found a radiologist's opinion unsupported, it would be clear that the ALJ had exceeded his role, and that the ALJ's own examination of the underlying medical facts was not "evidence," substantial or otherwise. An ALJ may not discount a medical source's opinion based on inconsistencies that do not actually exist, *Holden v. Astrue*, No. 4:10CV742 RWS FRB, 2011 WL 2730914, at *37 (E.D. Mo. June 15, 2011), *R. & R. adopted*, 2011 WL 2730936 (E.D. Mo. July 12, 2011), nor may an ALJ pick and choose only evidence in the record buttressing his conclusion, *Taylor ex rel. McKinnies v. Barnhart*, 333 F. Supp. 2d 846, 856 (E.D. Mo. 2004). The same principles apply here.

While the Social Security Act requires that impairments, including mental impairments, must be medically determinable, making such a medical determination will often require a clinician to take account of a patient's subjective reports. *Brand v. Sec'y of Dep't of Health, Ed. & Welfare*, 623 F.2d 523, 526 (8th Cir. 1980) ("Any medical diagnosis must necessarily rely upon the patient's history and subjective complaints. The Secretary must necessarily give some consideration to subjective complaints even though they are not necessarily corroborated by objective findings. *To fail to do so is error*.") (emphasis added). This is particularly true in the field of mental health. "[P]sychology and psychiatry are, by definition, dependent on subjective presentations by the patient. Taken to its logical extreme, the ALJ's rationale for rejecting [the physician's] conclusions would justify the

26

rejection of opinions by all mental health professionals, in every case." *Winning v. Comm'r of Soc. Sec.*, 661 F. Supp. 2d 807, 821 (N.D. Ohio 2009), *quoted in Fursteneau*, 2020 WL 3287947, at *5.

In addition to the foregoing, the Court cannot accept the ALJ's finding that Ms. Westin's opinions were unsupported because Plaintiff had not attempted suicide [17] or that Ms. Westin's assertion that Plaintiff had suffered from his mental illness for two years was unsupported. For the reasons set forth immediately above, Ms. Westin acted legitimately in giving as her opinion that Plaintiff had suffered from a mental illness for two years based on her own clinical observations, those of other professionals, and Plaintiff's subjective reports.

For all these reasons, the ALJ's finding that Ms. Westin's opinions were not supported was error. Ms. Westin was the clinician who had far and away the most time with Plaintiff. The ALJ's erroneous consideration of her opinions was serious enough to require that this case be remanded to the Commissioner for further consideration of those opinions pursuant to 20 C.F.R. § 404.1520c.

## B.    The ALJ Properly Evaluated the State Agency Psychologists' Opinions.

The Court finds no error in the ALJ's consideration of the opinions of the State Agency Psychologists. Plaintiff points out that both Dr. Boyd and Dr. Cohen concluded that Plaintiff required a "reasonably supportive supervisory style" and claims  that the

---

[17] Plaintiff reported to Ms. Leaders that he had, in fact, attempted suicide twice. (R. 440.)

ALJ's alleged failure to include this limitation in his RFC was error. (Pl.'s Mem. Supp. Mot. Summ. J. at 14.)

Plaintiff has overlooked that the RFC included as a limitation "[i]nteractions with *supervisors* and co-workers limited to occasional and superficial interaction such that work is rated no lower than '8' on the people scale of appendix B to the DOT, 1991 revised edition." (R. 17) (emphasis added). As noted above in footnote 8 to this Report and Recommendation, the quoted language translates into the most limited and low-stress interaction possible with, among others, Plaintiff's supervisors. Plaintiff has also overlooked that Dr. Boyd's conclusion, in full, was "[c]laimant's ability to handle supervision would be *restricted secondary to reduced stress tolerance* but adequate to cope with reasonably supportive supervisory styles that could be expected to be found in many customary work settings." (R. 185) (emphasis added). The restriction the ALJ placed in Plaintiff's RFC is a restriction that will reduce stress. In short, contrary to Plaintiff's claim, the restriction that Plaintiff seeks was, in fact, placed into Plaintiff's RFC by the ALJ. Plaintiff has not shown how the ALJ erred by limiting Plaintiff's interactions with supervisors in the way that he did, or how the language used by the ALJ in his RFC differs in any way that matters from the language used by Dr. Boyd and Dr. Cohen.

Accordingly, based on the foregoing, and on all the files, records, and proceedings herein, **IT IS HEREBY RECOMMENDED THAT**:

1.      Plaintiff's Motion for Summary Judgment (Dkt. No. 17) be **GRANTED IN PART AND DENIED IN PART**;

28

2.      Defendant's Motion for Summary Judgment (Dkt. No. 19) be **GRANTED IN PART AND DENIED IN PART;**

3.      This matter be **REMANDED** to the Commissioner for further consideration of the opinions of Ms. Westin in accordance with 20 C.F.R. § 404.1520c; and

4.      **JUDGMENT BE ENTERED ACCORDINGLY.**

Dated: July 28, 2023            *s/ John F. Docherty*
                                    JOHN F. DOCHERTY
                                    United States Magistrate Judge

## NOTICE

**Filing Objections**: This Report and Recommendation is not an order or judgment of the District Court and therefore is not appealable directly to the Eighth Circuit Court of Appeals. Pursuant to D. Minn. LR 72.2(b)(1), a party may file and serve specific written objections to this Report and Recommendation within fourteen days. A party may respond to objections within fourteen days. All objections and responses must comply with the word or line limits set forth in LR 72.2(c).